

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

January 13, 2025

**By ECF and Email**
Hon. Arun Subramanian
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:    *United States v. Reality Lucas*, 21 Cr. 382 & 24 Cr. 143 (AS)

Dear Judge Subramanian:

The Government respectfully submits this letter to advise the Court of the evidence the Government expects to present at the *Fatico* and violation-of-supervised-release hearing scheduled for January 15, 2025 (the "Hearing"), and to advise the Court of anticipated evidentiary disputes between the parties. This letter also sets forth the Government's anticipated position at sentencing, following the Hearing, with respect to the application of the United States Sentencing Guidelines (the "Guidelines").

### I.    Background

#### A.    Case No. 24 Cr. 143 (AS)

On April 3, 2024, defendant Reality Lucas pleaded guilty, without the benefit of a plea agreement, to Count One of Indictment 24 Cr. 143. Count One charges the defendant with possessing, on or about January 17, 2024, a firearm—specifically, a .380 caliber semi-automatic Hi-Point Firearms pistol, model CF380 (the "Pistol"), loaded with seven 380 caliber cartridges—after a felony conviction. (*See* November 8, 2024 Presentence Investigation Report ("PSR") ¶¶ 4; Dkt. 1.) In advance of sentencing, the United States Probation Department ("Probation") submitted the PSR, which included certain paragraphs referencing the defendant's prior arrest on December 22, 2023, for an assault that was reported on December 21, 2023 (the "Assault"). (*See* PSR ¶¶ 10, 11, 35, 41.) The Assault and ensuing arrest of Mr. Lucas for the Assault led to the January 17, 2024 Probation search of a bedroom where Mr. Lucas had been staying, during which search the Pistol was recovered. (*See id.*, ¶¶ 11-15; *see also id.*, p. 9.)

More specifically, with respect to the Assault, the PSR states, in substance, the following: On December 21, 2023, a female victim ("Victim-1") reported to the New York City Police Department ("NYPD") that, during an argument with Mr. Lucas earlier that evening, Mr. Lucas threatened to shoot her with a gun. (*Id.* ¶ 10.) Victim-1 further reported to law enforcement that

January 13, 2025
Page 2

Mr. Lucas left the room for a moment, returned with a gun, and struck her in the face with the gun, causing pain and bruising.  (*Id.*)  Victim-1 called 911 to report the Assault and went to the hospital the same night for the pain that she suffered as a result of it.[1]  (*Id.* ¶¶ 10, 35.)

On October 25, 2024, Mr. Lucas objected to the inclusion of paragraphs 10, 11, 35, and 41 of the PSR, which related to the Assault.  (*Id.*, p. 23.)  Following the Government's response opposing the defendant's objection (*see id.*), and additional submissions by the parties addressing the nature of any factual dispute (*see* Dkt Nos. 28, 34, 36, 39), on December 19, 2024, the Government requested a *Fatico* hearing in order to present evidence to the Court regarding the Assault (Dkt. 40).  As explained in the Government's December 19, 2024 letter, whether the defendant committed the Assault, and the facts surrounding the Assault, are relevant both to the "appropriateness of any sentencing Guidelines enhancements" and the application of the Section 3553(a) factors.  (Dkt. 40.)  On December 20, 2024, the Court granted the Government's request for a hearing.  (*See* Dkt. 41.)

### B.    Case No. 21 Cr. 382 (AS)

#### 1.    *The Violation Report*

Probation's January 13, 2025 violation report charges Mr. Lucas with ten supervised-release violation specifications.[2]  The Government understands that Mr. Lucas does not intend to admit to any of the specifications.  As set forth below, Specifications 1 through 5 relate to the Assault described above and Mr. Lucas's unlawful possession of a gun during the Assault; Specifications 6 and 7 relate to Mr. Lucas's unlawful possession of the Pistol on or about January 17, 2024, *i.e.*, the unlawful gun possession underlying Mr. Lucas's guilty plea in 24 Cr. 143 (AS); Specification 8 relates to Mr. Lucas's failure to notify Probation of a change in residence; and Specifications 9 and 10 relate to Mr. Lucas's positive drug tests for marijuana and amphetamines. Specifically, the Specifications set forth in the violation report are, in substance, as follows:

1. On or about December 21, 2023, Mr. Lucas committed the federal crime of possessing a firearm after a felony conviction, in violation of 18 U.S.C. § 922(g)(1).

---

[1] On December 22, 2023, Mr. Lucas surrendered to police on state charges relating to the Assault. (*See* PSR ¶¶ 10-11.)  Those charges were subsequently dismissed after Victim-1 declined to pursue charges against him.  (*Id.* ¶ 41.)

[2] The January 13, 2025 violation report amended the March 21, 2024 violation report to reflect a small set of minor technical changes for clarity and accuracy, and to note four additional positive marijuana drug tests.  For example, the amended report corrected the year referenced in Specification 7 from "2023" to "2024," and removed the reference to "January 17, 2024" in Specification 5, because the same date had been referenced in Specification 7.  The amended report did not include any substantive changes, apart from the additional positive drug tests noted above. Accordingly, the Government does not expect the amendment of the violation report to materially alter the scope of the Hearing.  The Government respectfully requests, however, that Mr. Lucas be arraigned on the January 13, 2025 violation report at the outset of the Hearing.

January 13, 2025
Page 3

2. On or about December 21, 2023, Mr. Lucas committed the state crime of assault in the second degree, a felony, in violation of New York Penal Law § 120.05(2).

3. On or about December 21, 2023, Mr. Lucas committed the state crime of criminal possession of a weapon in the third degree, a felony, in violation of New York Penal Law § 265.02.

4. On or about December 21, 2023, Mr. Lucas committed the state crime of menacing in the second degree, a misdemeanor, in violation of New York Penal Law § 120.14.

5. On or about December 21, 2023, Mr. Lucas possessed a firearm and ammunition, in violation of a condition of supervised release.

6. On or about January 17, 2024, Mr. Lucas committed the federal crime of possessing a firearm after a felony conviction, in violation of 18 U.S.C. § 922(g)(1).

7. On or about January 17, 2024, Mr. Lucas possessed a firearm, in violation of a condition of supervised release.

8. On or about June 8, 2023, and thereafter, Mr. Lucas resided at an address not approved by Probation and failed to notify Probation of a change in living conditions, in violation of a condition of supervised release.

9. On or about June 16, 2023, June 27, 2023, August 1, 2023, September 11, 2023, September 18, 2023, November 28, 2023, December 14, 2023, December 27, 2023, and January 10, 2024, Mr. Lucas used a controlled substance, *i.e.*, marijuana, in violation of a condition of supervised release.

10. On or about August 21, 2023, and September 11, 2023, Mr. Lucas used a controlled substance, *i.e.*, amphetamines, in violation of a condition of supervised release.

2.    *The Elements of the State Crimes*

The elements of the state crimes that the Government will seek to prove at the VOSR Hearing are as follows.

With respect to Specification 2, a person commits assault in the second degree, in violation of New York Penal Law § 120.05(2), if he (1) with intent to cause physical injury to another person, (2) causes such injury to such person, (3) by means of a deadly weapon or dangerous instrument. *See* N.Y.P.L. §120.05(2).

With respect to Specification 3, a person commits criminal possession of a weapon in the third degree, in violation of New York Penal Law § 265.02, if he (1) knowingly possesses a firearm, and (2) has been previously convicted of any crime. *See* N.Y.P.L. §§ 265.02(1), 265.02(2); 6 N.Y. Prac., Crim. Law § 33:12 (4th ed.).

January 13, 2025
Page 4

With respect to Specification 4, a person commits menacing in the second degree, in violation of New York Penal Law § 120.14, if he (1) intentionally places or attempts to place someone in reasonable fear of physical injury, serious physical injury or death, (2) by displaying a deadly weapon, dangerous instrument or what appears to be a firearm. *See* N.Y.P.L. § 120.14(1); 6 N.Y. Prac., Crim. Law § 5:21 (4th ed.).

As relevant to Specifications 2 and 4, "physical injury" is defined as an "impairment of physical condition or substantial pain." N.Y.P.L. § 10.00(9). As New York courts have explained, "[p]ain need not . . . be severe or intense to be substantial," but must be "more than slight or trivial." *People v. Dowdell*, 185 N.Y.S.3d 454, 455 (App. Div. 2023) (quotation marks and citation omitted). "Factors relevant to an assessment of substantial pain include the nature of the injury, viewed objectively, the victim's subjective description of the injury and his or her pain, whether the victim sought medical treatment, and the motive of the offender." *Id.* (quotation marks and citation omitted); *see also People v. Chiddick*, 8 N.Y.3d 445, 448 (N.Y. 2007) ("Motive is relevant because an offender more interested in displaying hostility than in inflicting pain will often not inflict much of it."). Thus, the court may consider, among other things, the "nature of the assault itself" as "evidence that the victim suffered 'substantial pain,'" as well as whether the victim sought medical treatment for the injury. 6 N.Y. Prac., Crim. Law § 5:3 (4th ed.). In general, "petty slaps, shoves, kicks and the like out of hostility, meanness and similar motives" are deemed not to cause "substantial pain." 6 N.Y. Prac., Crim. Law § 5:3 (4th ed.) (brackets and citations omitted). On the other hand, the New York Court of Appeals has recognized that a victim experienced "substantial pain" from a bite that broke his fingernail and caused bleeding, where the victim testified that he experienced "moderate" pain. *See Chiddick*, 8 N.Y.3d at 447-48.

## II.    The Government's Expected Proof

### A.    Witnesses

The Government currently expects to call three witnesses at the Hearing: Victim-1, Mr. Lucas's supervising probation officer at the time of the Assault ("Probation Officer-1"), and a probation officer who participated in the search of the bedroom where the Pistol was found ("Probation Officer-2").

Victim-1. The Government expects Victim-1 to testify about the Assault. In particular, the Government expects Victim-1 to testify, consistent with prior statements that Victim-1 has made to law enforcement regarding the Assault, including on a 911 call (the "911 Call") that she placed moments after the Assault; to police officers who responded to the 911 Call several minutes later; to medical personnel at the hospital, where Victim-1 received treatment on the night of the Assault; to law enforcement personnel during interviews on March 12, 2024, and January 13, 2025; and in federal grand jury testimony on March 13, 2024. As described further below, the Government also expects to offer exhibits reflecting certain of these prior statements at the Hearing.

In particular, the Government expects Victim-1 to testify, in sum and substance, as follows: On the night of December 21, 2023, Victim-1 was visiting a relative's apartment in Harlem, New

January 13, 2025
Page 5

York, when Mr. Lucas unexpectedly arrived at the relative's apartment.  Victim-1 had previously dated Mr. Lucas, who also goes by the name "Mike Jones."  After Mr. Lucas arrived, Victim-1 and Mr. Lucas began to argue.  During the dispute, Mr. Lucas threatened to harm Victim-1.  Mr. Lucas then left the room and, when he returned a few second later, took a small black handgun out of his pocket, and hit Victim-1 on the right side of her temple with the handgun.  The Assault caused Victim-1 to experience pain and left a red mark on the right side of her temple.  Victim-1 also developed a painful headache that lasted for a few days after she was hit with the gun.

After being struck with the gun, Victim-1 called 911, and Mr. Lucas fled the apartment. NYPD Officers responded quickly and encountered Victim-1 in the entrance of the building. Victim-1 reported the Assault to the responding officers and then went to the hospital, where she was examined and was given over-the-counter pain medication for her injuries.[3]

Probation Officer-1.  The Government expects Probation Officer-1 to testify, in sum and substance, as follows.  Probation Officer-1 was Mr. Lucas's supervising Probation Officer from approximately June 2023 through at least March 2024.  In December 2023, Probation received a report from the NYPD regarding Mr. Lucas's arrest on charges relating to the Assault described above.  Mr. Lucas also reported his arrest to Probation and Probation Officer-1 spoke to Mr. Lucas about the arrest.  Mr. Lucas told Probation Officer-1 that the arrest arose from a verbal dispute that he had with Victim-1, but Mr. Lucas denied that there was a firearm involved.

With respect to Specifications 6 through 8, Probation Officer-1, together with other Probation officers and members of law enforcement, participated in the planning and execution of Probation's January 17, 2024 compliance search operation.  On the morning of January 17, 2024, Probation Officer-1 and other probation officers went to Mr. Lucas's mother's address, which was the sole address that Mr. Lucas had provided to Probation as his place of residence.  Mr. Lucas was not at that apartment, and Mr. Lucas's mother advised Probation that Mr. Lucas frequently stayed at a different, nearby apartment, in a building located at a particular address in Manhattan (the "Second Residence"). Shortly thereafter, while Probation Officer-1 remained at Mr. Lucas's mother's address, other Probation officers conducted a search of the Second Residence.  (As described below, Probation Officer-2 was one of the officers who participated in the search of the Second Residence, and is expected to testify regarding that search.)

With respect to Specifications 9 and 10 (Mr. Lucas's positive drug tests), Probation Officer-1 has reviewed the drug test reports and associated chain of custody documents for Mr. Lucas's positive drug tests for marijuana and amphetamines, which were for urine samples

---

[3] In the event Victim-1 does not testify at the hearing, the Government expects to have available, and potentially call as a witness, an NYPD detective (the "Detective") who attended the March 12, 2024 interview of Victim-1, and to have available, and potentially call as a witness, a U.S. Attorney's Office paralegal (the "Paralegal") who attended the January 13, 2025 interview of Victim-1.  The Government expects the Detective and Paralegal would testify, in sum and substance, as to Victim-1's statements describing the Assault during each of the respective interviews referenced above.  The Detective's and Paralegal's testimony regarding such statements is admissible at the Hearing for the reasons set forth below.

January 13, 2025
Page 6

collected from Mr. Lucas at his treatment provider and the Probation office between June 2023 and January 2024.  In addition, Probation Officer-1 is familiar with the process by which Probation collects and processes urines samples.  In particular, Probation Officer-1 is aware that, after Probation collects a urine sample or receives a urine sample collected offsite, Probation tests the sample. Probation then sends any samples that test positive to Abbott (also known as Alere Toxicology Services, Inc.) for testing to confirm the positive result.  Probation also completes a document reflecting the chain of custody of the sample from Probation to Abbott.

With respect to Mr. Lucas's drug tests, the urines samples collected on the dates identified in Specifications 9 and 10 tested positive for marijuana (nine times) and amphetamines (twice).[4]

Probation Officer-2.  The Government expects Probation Officer-2 to testify, in sum and substance, regarding the search of the Second Residence on January 17, 2024, as follows. Probation Officer-2 was the search coordinator for the search of the Second Residence, and participated in that search.  During the search, probation officers found various items bearing Mr. Lucas's name and identifying information, including pieces of mail, an employee identification card, prescription medication bottles, and a driver's licenses.  In addition, probation officers found the Pistol, as well as a green and black pellet gun.

### B.    Government Exhibits

The Government currently expects to offer the following exhibits, among others, at the Hearing:

- *GX 101, GX 101-T, GX S1.*  A recording of the 911 Call placed by Victim-1 on December 21, 2023, reporting the Assault; a transcript of the 911 Call; and the parties' stipulation to the authenticity of GX 101 and the accuracy of GX 101-T.

- *GX 102, GX 103, GX 108, GX 102-T, GX 103-T, GX 108-T, GX S5.*  Video footage from body-worn camera of NYPD officers who responded to the 911 Call; transcripts of such

---

[4] While the Government understands that Mr. Lucas does not intend to admit to any of the specifications set forth in the violation report, Mr. Lucas has not objected to the facts underlying Specifications 6 through 9 in the PSR (as to Specification 10, the positive drug tests for amphetamines are not referenced in the PSR).  (*See* PSR ¶¶ 12-15 (describing Probation's search of the Second Residence and the recovery of the Pistol, which corresponds to Specifications 6 and 7); *id.* ¶ 55 (noting that Mr. Lucas did not notify Probation that he was residing at the Second Residence, which corresponds to Specification 8); *id.* ¶ 67 (listing the six positive marijuana drug tests, which corresponds to Specification 9).  In addition to the witness testimony and exhibits described herein, the Court may, in connection with sentencing, rely on these undisputed portions of the PSR. *See* Fed. R. Crim. P. 32(i) ("At sentencing, the court . . . may accept any undisputed portion of the presentence report as a finding of fact."); *see also United States v. Romano*, 825 F.2d 725, 730 (2d Cir. 1987) (district court, at sentencing, properly "consider[ed] all undisputed, relevant information" in PSR).

January 13, 2025
Page 7

video footage; and the parties' stipulation to the authenticity of the footage and the accuracy of the transcripts.

- *GX 104, 107, GX S3.*  A photograph of Victim-1's face taken on the night of the Assault; a photograph of the Pistol; and the parties' stipulation to the authenticity of the photographs.

- *GX 105, GX S4.*  Victim-1's hospital records from December 22, 2023, and the parties' stipulation to the authenticity of such records and their qualification as business records.

- *GX 106.*  Victim-1's federal grand jury testimony on March 13, 2024.[5]

- *GX 109.*  The defendant's August 14, 2024 guilty plea transcript in Case No. 24 Cr. 143 (AS).

- *GX 110.*  The Pistol.

- *GX 200 Series.*  Drug test reports and chain of custody documents for the positive drug tests identified in Specifications 9 and 10.[6]

- *GX 300 Series.*  Photographs from Probation's search of the Second Residence

### III.    Admissibility of Victim-1's Prior Statements

While the Government expects that the parties will stipulate to the authenticity of records reflecting Victim-1's prior statements to law enforcement, the Government understands that Mr. Lucas intends to argue that such records are inadmissible on hearsay grounds.  As explained below, the exhibits that the Government intends to offer are admissible under the excited utterance, present sense impression, and/or medical treatment and diagnosis hearsay exceptions, and/or are admissible as reliable hearsay under the rules that apply at sentencing and VOSR hearings.

---

[5] The Government respectfully requests that the hospital and grand jury transcript exhibits be admitted under seal, in light of the sensitive medical information in the former and the grand jury secrecy rules governing the latter.  *See United States v. Monge*, No. 17 Cr. 611-12 (AT), 2020 WL 3872168, at *1 n.1 (S.D.N.Y. July 9, 2020) (finding that the defendant's "privacy interest in his medical records outweighs the public right of access to judicial documents" and filing such records under seal); Fed. R. Crim. P. 6(e) (relating to grand jury secrecy); *see also United States v. Arrington*, No. 15 Cr. 33 (RJA), 2021 WL 5369824, at *11 (W.D.N.Y. Nov. 18, 2021) (granting motion to seal filings that verbatim quoted from grand jury proceedings).

[6] The Government reserves the right to amend these exhibits, offer additional exhibits, and call additional witnesses at the hearing, and will promptly notify the Court and defense counsel of any such changes.

January 13, 2025
Page 8

### A.    Applicable Law

#### 1.    *The Rules of Evidence and Confrontation Clause Do Not Apply*

"The federal rules of evidence do not apply to sentencing proceedings." *United States v. Arias Casilla*, No. 21 Cr. 218 (AT), 2023 WL 24245, at *2 (S.D.N.Y. Jan. 3, 2023) (citing Fed. R. Evid. 1101(d)(3) and U.S.S.G. § 6A1.3(a)). Likewise, "it is settled law that the Confrontation Clause of the Sixth Amendment does not apply to evidence received during a sentencing hearing." *United States v. Bedell*, 590 F. App'x 86, 88 (2d Cir. 2015). Similarly, a supervised release revocation hearing "is not a formal trial," and the "usual rules of evidence need not be applied." Fed. R. Crim. P. 32.1, Advisory Committee Notes (1979); *United States v. Aspinall*, 389 F.3d 332, 344 (2d Cir. 2004) (discussing probation revocation proceedings), *abrogated on other grounds by United States v. Booker*, 543 U.S. 220 (2005); *see also United States v. Bari*, 599 F.3d 176, 179 (2d Cir. 2010) ("[T]he Federal Rules of Evidence, except those governing privileges, do not apply in supervised release revocation proceedings."). The "full panoply of procedural safeguards does not attach to revocation proceedings" because a "probationer already stands convicted of a crime." *United States v. Carlton*, 442 F.3d 802, 809 (2d Cir. 2006) (citation and quotation marks omitted). As with sentencing hearings, "the Confrontation Clause of the Sixth Amendment does not apply to supervised-release revocation hearings." *United States v. Williams*, 443 F.3d 35, 45 (2d Cir. 2006). Because neither the Confrontation Clause nor the Federal Rules of Evidence apply at sentencing hearings or VOSR hearings, it is well established that hearsay is admissible in both types of proceedings, provided that such admission is consistent with the Due Process Clause and, with respect to VOSR hearings, Rule 32.1 of the Federal Rules of Criminal Procedure.

#### 2.    *The Rules Governing Admissible Hearsay*

Specifically, with respect to sentencing hearings, the Court is "free to consider hearsay evidence . . . so long as it permissibly concludes that the evidence is reliable." *Arias Casilla*, 2023 WL 24245, at *2 (S.D.N.Y. Jan. 3, 2023) (quoting *United States v. Kolawole*, 1 Fed. App'x 93, 94–95 (2d Cir. 2001)). "In determining whether the proffered evidence is reliable, the Court must assure itself that the evidence is not 'materially incorrect,' that there is not 'a significant possibility of misinformation,' and that there is 'some minimal indicia of reliability' accompanying the hearsay statements sought to be admitted." *Id.* (quoting *United States v. Martinez*, 413 F.3d 239, 244 (2d Cir. 2005)). Courts thus routinely admit victim hearsay statements during sentencing hearings. *See, e.g.*, *United States v. Perez*, 523 F. App'x 842, 844 (2d Cir. 2013) ("Hearsay is admissible in sentencing proceedings. The district court therefore properly considered the victims' statements to investigators."); *see also, e.g.*, *United States v. McBride*, No. 22-814, 2023 WL 4282298, at *2 (2d Cir. June 30, 2023) (district court did not err in relying on victim's hearsay statements contained in police reports to support sentencing enhancement); *United States v. Skyfield*, 23 Cr. 569 (LJL) (S.D.N.Y. July 22, 2024), Dkt. 71 at 17, 48-51 (relying on victim's hearsay statements in police reports and video surveillance at sentencing proceeding when making findings on disputed facts).

With respect to VOSR hearings, hearsay that "is admissible under an established exception to the hearsay rule" may be admitted in revocation hearings. *Williams*, 443 F.3d at 45; *see also United States v. Diaz*, 986 F.3d 202, 209 (2d Cir. 2021). Moreover, regardless of whether an

January 13, 2025
Page 9

established hearsay exception applies, where the Government seeks to introduce hearsay statements of a witness who also testifies at the hearing, such hearsay is admissible so long as it "bears sufficient indicia of reliability." *Diaz*, 986 F.3d at 210; *see also id.* at 209-210 (concluding that Rule 32.1(b)(1)(C)'s requirement that the Court make a finding of "good cause" before admitting hearsay does not apply if the hearsay declarant also testifies at the hearing). Where a hearsay declarant does *not* testify, however, hearsay that is not otherwise admissible pursuant to an established exception is admissible when "good cause" exists to deny the defendant the opportunity to confront the declarant. Fed. R. Crim. P. 32.1(b)(1)(C); *United States v. Carthen*, 681 F.3d 94, 100 (2d Cir. 2012) (citing *Williams*, 443 F.3d at 45). "To determine whether good cause exists, the court must balance, on the one hand, the defendant's interest in confronting the declarant, against, on the other hand, the government's reasons for not producing the witness and the reliability of the proffered hearsay." *United States v. Peguero*, 34 F.4th 143, 154 (2d Cir. 2022).

### 3.    *Established Hearsay Exceptions*

As relevant here, the excited utterance exception to the rule against hearsay permits the admission of a hearsay "statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Fed. R. Evid. 803(2). "The rationale for this hearsay exception is that the excitement of the event limits the declarant's capacity to fabricate a statement and thereby offers some guarantee of its reliability." *United States v. Tocco*, 135 F.3d 116, 127 (2d Cir. 1998). The excited utterance exception can apply to statements made hours after a traumatic event, so long as the stress of the condition caused by the event persists. *See, e.g.*, *United States v. Scarpa*, 913 F.2d 993, 1017 (2d Cir. 1990) (rejecting argument that statements made five or six hours after startling event could not be excited utterances and noting that the "length of time between the event and the utterance is only one factor to be taken into account"); *United States v. Peguero*, No. 06 Cr. 1155 (NSR), 2020 WL 5913309, at *5 (S.D.N.Y. Oct. 6, 2020) (admitting statement that domestic violence victim made to responding officer as an excited utterance because "it was made to the officer at the scene of the incident, shortly after the 9-1-1 call in which the Victim was excited, and while the Victim was still bleeding")*; Tocco*, 135 F.3d at 127 (affirming the admission of an excited utterance made three hours after startling information).

As to present sense impressions, Federal Rule of Evidence 803(1) defines a present sense impression as a "statement describing or explaining an event or condition made while or immediately after the declarant perceived it." Present sense impressions are "considered to be trustworthy because the contemporaneity of the event and its description limits the possibility for intentional deception or failure of memory." *Jones*, 299 F.3d at 112. "For statements to qualify as present sense impressions, precise contemporaneity is not required." *United States v. Ibanez*, 328 F. App'x 673, 675 (2d Cir. 2009); *see also* Fed. R. Evid. 803(1) advisory committee's note (1972) ("With respect to the time element, [803(1)] recognizes that in many, if not most, instances precise contemporaneity is not possible and hence a slight lapse is allowable."); *see also, e.g.*, Peguero, 2020 WL 5913309, at *4 (admitting 911 call that was placed 20 minutes after incident as present sense impression); *United States v. Steele*, 216 F. Supp. 3d 317, 322 (S.D.N.Y. 2016) (admitting, as present sense impressions, 911 call statements where call was made within minutes of the events).

January 13, 2025
Page 10

As to the medical treatment and diagnosis exception, a statement is admissible if it is "made for – and is reasonably pertinent to – medical diagnosis and treatment" and "describes medical history; past or present symptoms or sensations; their inception; or their general cause." Fed. R. Evid. 803(4). Under this rule, "[t]here is no requirement that the statements be made by the patient, or that the statements be made to a physician." *Shea v. Royal Enterprises, Inc.*, No. 09 Civ. 8709 (THK), 2011 WL 2436709, at *11 (S.D.N.Y. June 16, 2011). Courts have recognized statements contained in hospital records as falling within the scope of this rule, including in the context of domestic violence. *See, e.g.*, *United States v. Santiago*, 199 F. Supp. 2d 101, 108 (S.D.N.Y. 2002) ("[T]he Court notes that hospital records made for purposes of medical diagnosis or treatment are clearly admissible under federal rule of evidence 803(4)."); *United States v. Jackson*, 347 F. App'x at 703 ("[T]o the extent [the declarant] told treating hospital personnel that she had been assaulted by the father of her child (*i.e.*, [the defendant]), those statements would have been admissible without good cause balancing under the established hearsay exception of Fed. R. Evid. 803(4).").

4.    *Good Cause Under Rule 32.1(b)(1)(C)*

With respect to the Rule 32.1(b)(1)(C)'s "good cause" standard, the Second Circuit has repeatedly affirmed district courts' findings of "good cause" to admit reliable hearsay statements of domestic violence victims in revocation proceedings. *See, e.g.*, *Carthen*, 681 F.3d at 99-101 (affirming district court's finding of "good cause" to admit, at VOSR hearing, hearsay statements of defendant's ex-girlfriend who was the victim of assault by the defendant); *see also, e.g.*, *Peguero*, 34 F.4th at 155-56 (similar); *United States v. McCourty*, 789 F. App'x 232, 234 (2d Cir. 2019) (similar); *accord United States v. Hall*, 419 F.3d 980, 988 n. 6 (9th Cir.2005) (noting the "well recognized" difficulty of securing cooperation of domestic violence victims and that the most common reason for dismissal of domestic violence crimes is non-cooperation of victims).

B.    **Discussion**

1.    *Victim-1's Statements on the 911 Call and in Body Worn Camera Footage of Responding Officers Are Admissible under Established Hearsay Exceptions*

On December 21, 2023, at approximately 11:08 p.m., Victim-1 called 911 and, audibly upset and agitated, told the 911 operator, within 10 seconds of the start of the call, "my ex-boyfriend just hit me with a gun in my face." (GX 101, 101-T.) Less than 30 seconds later, Victim-1 shouted, "His name is Reality Lucas." (*Id.*)

NYPD officers responded to the scene approximately five minutes later, at 11:13 p.m., and immediately encountered Victim-1 in the lobby entrance of the apartment building. As reflected in officers' body-worn camera footage, the first words Victim-1 said to the responding officers were: "Yeah, my ex, he came out. We had a little words of dispute and he pulled out a gun and fucking hit me in my face with it." Within approximately 15 seconds of making that statement, Victim-1 described the gun she was hit with as "a little black one." A few seconds later, Victim-1 told officers, "His name is Reality Lucas." (GX 102 at 23:13:10-21:13:40.) Over the next 10 minutes, Victim-1 made similar statements describing the Assault and the circumstances leading up to it to NYPD officers on the scene, to an individual she was talking to on the phone, and to

January 13, 2025
Page 11

herself, at times raising her voice, at times swearing, and at times crying.  (*E.g.*, GX 102 at 23:15:00-23:15:42; GX 103 at 23:17:07-23:17:24; GX 108 at 23:19:38-23:22:08.)

The statements described above fall squarely within the scope of the excited utterance hearsay exception.  Victim-1 first described the Assault, *i.e.*, being struck in the face with a gun—an extremely startling event—on the 911 Call "just" after it occurred, while she was extremely agitated and under the stress of it.  As recorded on body worn camera footage, Victim-1 continued to describe the Assault to responding NYPD officers from approximately five to 15 minutes later, while still extremely upset and under the stress of the incident, as reflected in her tone of voice and demeanor (as noted above, at various points shouting, swearing, and crying).  Courts routinely admit excited utterances in similar circumstances, and indeed, in circumstances involving far longer time lapses than here.  *See, e.g.*, *Scarpa*, 913 F.2d at 1017 (affirming admission of statements made five or six hours after startling event); *Tocco*, 135 F.3d at 127 (same, where statements were made three hours after startling event); *United States v. Delvi*, 275 F. Supp. 2d 412, 415 (S.D.N.Y. 2003) (admitting as excited utterance gunshot victim's statement made to police at hospital 40 minutes after shooting); *see also United States v. Ramos*, No. 22 Cr. 431 (LJL), 2023 WL 9002868, at *2 (S.D.N.Y. Dec. 28, 2023) (collecting cases).

Victim-1's statements are also admissible as present sense impressions.  Courts have admitted as present sense impressions statements made minutes after the relevant events, and, "[e]ven where a longer time has passed between the events and the statement describing them, admission under Rule 803(1) can be 'buttressed by intrinsic reliability of the statements.'"  *Steele*, 216 F. Supp. 3d at 322-23; *see also United States v. Mejia-Valez*, 855 F. Supp. 607, 614 (E.D.N.Y. 1994) (admitting 911 call as present sense impression when made 16 minutes after relevant incident).  Here, the reliability of Victim-1's statements is bolstered by the stressful circumstances in which they were made—*i.e.*, shortly after Victim-1 was struck with a gun—and the consistency in Victim-1's repeated statements.  The intrinsic reliability of Victim-1's statements thus supports their admissibility as present sense impressions.

> 2.  *Victim-1's Statements Reflected in Hospital Records Are Admissible Under an Established Hearsay Exception*

As reflected in records obtained from Harlem Hospital, shortly after midnight on December 22, 2023—*i.e.*, approximately an hour after the Assault—Victim-1 arrived at Harlem Hospital. (GX 105 at 2.)  The "Arrival Complaint" noted in the hospital records is "hit in the face with a gun" (*id.* at 12), and doctor's notes in the records contain similar statements, *e.g.*, "25F with R head pain after being struck with a gun by ex-boyfriend" (*id.* at 8).  The hospital records further state that Victim-1 had "tenderness to palpation" (*id.* at 10) and "[r]edness to right eye" (*id.* at 12), and that she assessed her pain as a 6 out of 10 (*id.* at 14).  While the Discharge Instructions note that "[t]here are no signs of injury at this time or concern for bleeding inside your skull," those instructions further state that Victim-1 "can expect to have pain over the next several days."  (*Id.* at 25.)  The Discharge Instructions advised Victim-1 to take Tylenol or Motrin as needed for the pain.  (*Id.*)

The foregoing statements, and others like them, are plainly relevant and admissible under Rule 803(4), as they are made for medical diagnosis and treatment, and describe "symptoms,"

11

January 13, 2025
Page 12

"sensations," and/or "their general cause." Fed. R. Evid. 803(4); *see also, e.g.*, *Santiago*, 199 F. Supp. 2d at 108. Accordingly, they are admissible under an established hearsay exception.[7]

> 3. *The Above Statements by Victim-1 and Victim-1's Other Out-of-Court Statements Are Also Admissible as Reliable Hearsay and, in the Event Victim-1 Does Not Testify, for Good Cause*

Even if the above statements were not admissible under the foregoing hearsay exceptions, such statements bear sufficient indicia of reliability to render them admissible at a sentencing and VOSR proceeding. In addition, Victim-1's statements to law enforcement on March 12, 2024, and January 13, 2025 (which statements the Government may offer only if Victim-1 does not testify), and her statements during her federal grand jury testimony the next day, all of which were similar to Victim-1's earlier statements described above, are similarly reliable.

These statements at issue are reliable for numerous reasons. *First*, Victim-1's federal grand jury testimony was reliable because it was under oath. *Carthen*, 681 F.3d at 100 (considering the fact that certain hearsay statements were "under oath" as evidence of its reliability); *Peguero*, 34 F.4th at 156 (holding that district court "reasonably determined that the [victim's] sworn statement was sufficiently reliable to be admitted" at a VOSR hearing where victim did not testify). *Second*, all of Victim-1's statements were detailed and credible. *See Carthen*, 681 F.3d at 100. *Third*, the statements at issue, made numerous times over a period of approximately a year (*i.e.*, from the night of the Assault through January 13, 2025), were consistent with each other. *See Jackson*, 347 F. App'x at 703 (admitting hearsay where assault victim had "offered a number of detailed and consistent accounts of [the defendant] assaulting her"). *Fourth*, Victim-1's statements regarding the Assault are corroborated by other evidence, including the fact that she had a red mark on the side of her face in the spot where she said she was struck. *See, e.g.*, *Carthen*, 681 F.3d at 101 (noting the relevance of independent corroborating evidence). *Fifth*, while any one of these reasons alone would reflect that Victim-1's statements bear sufficient indicia of reliability, all of them together are far more than sufficient to render them reliable and admissible. *See McCourty*, 789 F. App'x at 235 (considering various pieces of reliable hearsay and concluding that "the hearsay evidence . . . was reliable as a whole").

In the event that Victim-1 does not testify at the Hearing (as noted above, the Government currently expects that she will), the Court, in the context of the VOSR hearing, must also balance the reliability of Victim-1's hearsay statements and the reasons for Victim-1's failure to testify

---

[7] As noted above, the Government also expects that the parties will stipulate that, as a threshold matter, the hospital records exhibit that contains the statements made for medical treatment and diagnosis is authentic and satisfies the prerequisites of the business records exception. *See* Fed. R. Evid. 803(6); *see also, e.g.*, *Hodges v. Keane*, 886 F.Supp. 352, 356 (S.D.N.Y.1995) ("Medical records[ ] . . . can be admissible under Federal Rule of Evidence 803(6), provided they are prepared in the regular course of business, near the time of occurrence, by a person with knowledge and are properly authenticated."); *Pace v. Nat'l R.R. Passenger Corp.*, 291 F.Supp.2d 93, 102 (D.Conn.2003) ("Medical reports can be admissible as business records.").

January 13, 2025
Page 13

against Mr. Lucas's interest in confronting her.[8] *Peguero*, 34 F.4th at 154. Here, while Mr. Lucas undoubtedly has an interest in confronting Victim-1, "[t]hat interest is somewhat diminished when," as here, "the Government's case does not rest solely on otherwise inadmissible hearsay," but instead rests in part on hearsay that is admissible under established hearsay exceptions. *McCourty*, 789 F. App'x at 234.

Mr. Lucas's diminished interest, moreover, is outweighed by the strong reliability of Victim-1's hearsay statements, as described above, and the reasons for Victim-1's potential failure to testify. In particular, while the Government has made diligent efforts to secure Victim-1's testimony, including subpoenaing Victim-1 to testify, Victim-1—like many other victims of domestic violence—is understandably reluctant to do so and fears for her safety. ███████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████[9] Thus, while the Government currently expects Victim-1 to testify, if she does not do so, there will be good cause to admit Victim-1's hearsay statements under Rule 32.1(b)(1)(C). *See; Peguero*, 34 F.4th at 155-56; *Carthen*, 681 F.3d at 99-101; *McCourty*, 789 F. App'x at 234; *United States v. Harris*, 838 F.3d 98, 107-09 (2d Cir. 2016).

4.    *Probation's Drug Test Reports Are Admissible*

The Government understands that defense counsel may also object to the admissibility of Probation's drug test reports and associated chain of custody documents (GX 200 series), notwithstanding that the defense did not object to paragraph 66 of the PSR relating to six of the positive marijuana drug tests.

Although the Second Circuit has not yet explicitly decided the question, *see United States v. Baker*, 522 F. App'x 10, 14 (2d Cir. 2013), numerous other Courts of Appeals have held that, in supervised release revocation hearings, courts properly admitted laboratory reports—similar to the drug test reports at issue here—without live testimony because good cause existed to do so. *See, e.g., United States v. Grandlund*, 71 F.3d 507, 510-11 (5th Cir. 1995), *opinion clarified*, 77 F.3d 811 (5th Cir. 1996); *United States v. Pierre*, 47 F.3d 241, 242-43 (7th Cir. 1995); *United States v. Redd*, 318 F.3d 778, 784-85 (8th Cir. 2003); *United States v. Siqueiros*, 1994 WL 134527, at *4-5 (9th Cir. Apr. 13, 1994) (table); *United States v. Evans*, 662 F. App'x 681, 684 (11th Cir. 2016).

Drug test reports and chain of documents are generally reliable. *See Grandlund*, 71 F.3d at 510 (explaining that "urinalysis reports are routine matters for" companies like Abbott "and

---

[8] Even if the Court concluded that the "good cause" standard was not satisfied, Victim-1's out-of-court statements would still be admissible at sentencing in Case No. 24 Cr. 143 as reliable hearsay for the reasons stated above, because Rule 32.1 applies only to VOSR hearings.

[9] The Government has redacted the preceding two sentences in its publicly filed letter, and respectfully requests that the unredacted letter be filed under seal, because the presumption of access to such information is outweighed by Victim-1's safety and privacy interests. *See United States v. Amodeo*, 71 F.3d 1044, 1050-51 (2d Cir. 1995).

January 13, 2025
Page 14

generally are considered reliable"); *Redd*, 318 F.3d at 784 (8th Cir. 2003) (similar); *Pierre*, 47 F.3d at 242 (similar); *McCormick*, 54 F.3d at 223 (similar). The value of any cross-examination relating to this documentary evidence, moreover, is unclear. *See Pierre*, 47 F.3d at 243 ("What was the technician going to say on the stand? One vial of urine looks like another; the technicians would not have remembered what they did with [the defendant's] specimens and therefore would have described their normal procedures, and the judge would not have been enlightened."); *McCormick*, 54 F.3d at 224 (similar). The facts of this case also corroborate the laboratory reports' reliability. The defendant returned at approximately nine positive marijuana drug tests in the space of seven months, between June 2023 and January 2024, and two positive drug tests for amphetamines in less than a month, between August and September 2023. As courts have noted, the fact that multiple independent tests corroborate one another supports a finding of good cause, because the likelihood that *all* the positive tests are false positives is so small. *See Redd*, 318 F.3d at 785 (pointing out fact of "six separate positive test results"); *Grandlund*, 71 F.3d at 511 (noting evidence consisted of "not one urine sample . . . but seven samples taken over a period of 15 months").

In addition, requiring the Government to call every individual who collected and processed the urine samples from Mr. Lucas's treatment provider and Probation, and every certifying lab technician from Abbott who tested them, would involve significant expense and inconvenience. In particular, in this case, at least five different Abbot lab technicians issued the laboratory reports at issue; the Government understands from publicly-available online records that each of these technicians may be based out of state (three in the Virginia area, and two in Louisiana). Accordingly, requiring the Government to call live witnesses to establish the test results for the relevant urine samples would involve the Government's calling numerous witnesses, including multiple witnesses based far away. And all this would be required even though Mr. Lucas has not identified any specific concern regarding the collection or testing process. Courts routinely recognize that such a burden is substantial and weighs heavily in favor of a finding of good cause. *See, e.g.*, *McCormick*, 54 F.3d at 224 (citing, as one relevant factor in affirming district court's good cause finding, "the difficulty and cost associated with requiring those technicians to appear at the hearing"); *Redd*, 318 F.3d at 784 (similar); *Grandlund* at 71 F. 3d at 511 (similar); *United States v. McElroy*, 860 F. App'x 59, 63-64 (5th Cir. 2021) (similar).

Accordingly, the Government respectfully requests that the Court admit the drug test reports and accompanying chain of custody documents at the Hearing.

## IV.    The Government's Expected Guidelines Calculation

The Government understands that Mr. Lucas opposes the application of Guidelines § 2K2.1(b)(6)(B) (the "(b)(6)(B) enhancement"), which provides, as relevant here, an increase of four offense levels where the defendant "used or possessed any firearm or ammunition in connection with another felony offense," here, assault in the second degree, in violation of N.Y. Penal Law § 120.05. U.S.S.G. § 2K2.1(b)(6)(B). The Government included that enhancement in its July 22, 2024 *Pimentel* letter, but did not pursue the enhancement at the PSR stage in light of Victim-1's decision not to pursue charges against Mr. Lucas at that time. (*See* PSR ¶ 5 n.1.) In response to Mr. Lucas's objections to the PSR paragraphs referencing the Assault, however, the Government closely reviewed its available evidence and requested that the Court schedule a

January 13, 2025
Page 15

hearing to permit the Government to offer evidence of the Assault and enable the Court to consider, *inter alia*, the appropriateness of any sentencing Guidelines enhancements.  (*See* Dkt. 40.)

The Government anticipates that the evidence at the Hearing will support the (b)(6)(B) enhancement.  The Government does not currently expect to argue that the Pistol that was recovered from Mr. Lucas's bedroom in January 2024 and the gun that he used to strike Victim-1 in December 2024 were the same gun.  The (b)(6)(B) enhancement, however, does not require the firearm that was "used or possessed . . . in connection with another felony offense" to be the firearm cited in the offense of conviction, provided that the defendant's possession of the charged and uncharged firearms were "part of the same course of conduct or common scheme or plan" such that the uncharged possession constituted "relevant conduct."  *See* U.S.S.G. § 2K2.1, App. Note. 14(E)(ii); *see also* U.S.S.G. § 1B1.3(a)(2); *id.*, App. Note. 5(B).

Here, Mr. Lucas possessed the Pistol within a month after he used a gun to strike Victim-1.  Courts have found similar periods of time—and even longer periods of time—short enough to render the uncharged possession of a firearm "relevant conduct" for purposes of sentencing.  *See United States v. Parlor*, 2 F.4th 807, 812, 815 (9th Cir. 2021) (noting that an "eleven-week time span" was "well within the range that courts have accepted" in finding possession of uncharged firearms was relevant conduct, and applying the (b)(6)(B) enhancement based on a separate felony offense facilitated by an uncharged firearm); *see also United States v. Fortune*, No. 22-1179-CR, 2023 WL 6439886, at *1 & n.1 (2d Cir. Oct. 3, 2023) ("When a defendant has been convicted of unlawful possession of a firearm as a felon, courts generally decide that the defendant's recent possession of other firearms is sufficiently related to the offense of conviction to qualify as part of the same course of conduct." (citing cases)); *see also, e.g., id.* (possession of uncharged firearms four months prior to possession of charged firearms was "relevant conduct" under Section 1B1.3 of the Guidelines); *United States v. Santoro*, 159 F.3d 318, 321 (7th Cir.1998) (possession of assault rifle "within a six to nine month period" of arrest for possession of two other guns was "relevant conduct").  *See generally United States v. Parlor*, 2 F.4th 807, 812 (9th Cir. 2021) ("When a person prohibited from possessing firearms under federal law possesses other firearms in addition to the ones for which he was charged, these other uncharged firearms can be 'relevant conduct' under the Sentencing Guidelines.").

Accordingly, assuming Mr. Lucas receives a deduction of three points for acceptance of responsibility, the Government expects to argue that Mr. Lucas's offense level is 15.[10]  With a

---

[10] While the Government expects that it will not oppose a deduction for acceptance of responsibility points if Mr. Lucas merely declines to admit to Specifications 6 and 7 (which relate to his possession of the Pistol on January 17, 2024), if Mr. Lucas affirmatively disputes, through testimony or counsel's arguments, the factual basis for those Specifications—*i.e.*, the core conduct that underlies the firearm possession offense to which he pleaded guilty in 24 Cr. 143 (AS)—he will not be entitled to a deduction of acceptance points.  *See* U.S.S.G. 3E1.1, App. Note. 1(A) ("A defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility."); *see also United States v. Jimenez-Rodriguez*, No. 21 Cr. 194 (EK), 2024 WL 1199991, at *6 (E.D.N.Y. Mar. 20, 2024) (noting that "'[f]rivolously contests' [for purposes of U.S.S.G. § 3E1.1] may apply to a

January 13, 2025
Page 16

criminal history category of III, Mr. Lucas's expected Guidelines range is 24 to 30 months' imprisonment.[11]

Respectfully submitted,

EDWARD Y. KIM
Acting United States Attorney
Southern District of New York

By: _____
Adam Z. Margulies
Assistant United States Attorney
Julie Isaacson
Special Assistant United States Attorney
(212) 637-2345 / 2307

Cc:    Sylvie Levine, Esq. (by ECF and e-mail)
       U.S. Probation Officer John Gomez (by e-mail)

---

lawyer's arguments"). The Second Circuit has repeatedly upheld the denial of acceptance points after a guilty plea where the defendant falsely denies or frivolously contests relevant conduct prior to sentencing. *See, e.g.*, *United States v. Carmona*, 361 F. App'x 166, 169 (2d Cir. 2010) (summary order) (affirming denial of acceptance points where, "although [the defendant] pleaded guilty to the charged offense, he nevertheless refused to admit to the full extent of his participation in the charged conspiracy," and collecting similar cases); *United States v. Green*, 234 F.3d (Table) 1263, at *1 (2d Cir. 2000) (summary order) (affirming denial of acceptance points where the district court concluded that "the repeated denial of relevant conduct actually charged in the indictment outweighed the determination to plead guilty"); *United States v. Reyes*, 9 F.3d 275, 279 (2d Cir. 1993) (affirming denial of acceptance points where, "[a]lthough [the defendant] accepted responsibility for conduct that satisfies the bare essentials of the offense of conviction, his explanation of his conduct was, in the eyes of the district judge, 'unbelievable'").

[11] Notwithstanding the Government's anticipated Guidelines position set forth above, the Government continues to expect that its recommended sentence in 24 Cr. 143 (AS) will be 50 months' imprisonment, based on the application of the § 3553(a) factors, as set forth in the Government's December 15, 2024 sentencing submission.